SOUTHWEST ARKANSAS COMMUNICATIONS, INC.
*v.* James Eric ARRINGTON

88-36                                                         753 S.W.2d 267

Supreme Court of Arkansas
Opinion delivered July 5, 1988

*Smith, Stroud, McClerkin, Dunn & Nutter*, by: *John F. Stroud, Jr.*, for appellant.

*Graves & Graves*, by: *Albert Graves, Jr.*, for appellee.

ROBERT H. DUDLEY, Justice. The appellant asks us to

overrule our case interpreting the usury amendment to the Constitution of Arkansas. We decline the invitation.

The appellant sold the appellee a television satellite dish on January 27, 1987, and a television and videocassette recorder on February 17, 1987. The purchases were to be paid for through the use of a revolving charge agreement with an interest rate of 12.5% per annum. At the time the federal reserve discount rate was 5.5%; thus, the interest rate was more than 5% above the federal reserve discount rate. After making two payments the appellee filed suit alleging that he had been charged an usurious rate of interest. The appellant counterclaimed, alleging that the entire debt was due and that it was entitled to foreclosure. The chancellor decreed that the revolving charge agreement was void as to all unpaid interest and that the appellee was entitled to double recovery of the interest paid. We affirm.

In 1982, Article 19, Section 13 of the Constitution of Arkansas was amended by the passage of Amendment 60 to read in part as follows:

§ 13. Maximum lawful rates of interest.

(a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.

(ii) All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.

(b) Consumer Loans and Credit Sales: All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the General Assembly

shall prohibit the same by law.

The following year, in July 1983, this court was called upon to interpret the amendment's provisions in *Bishop* v. *Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983). At issue in *Bishop* was the interest that could be charged on consumer loans and credit sales under Amendment 60. Utilizing the plain meaning rule, this Court held:

> The language used in Amendment 60 is clear and unambiguous, and we have no authority to construe the amendment to mean anything other than what it says. Section 13(a)(i) provides that the "maximum lawful rate of interest on *any* contract" (emphasis ours) shall not exceed 5 percent per annum above the Federal Reserve Discount Rate at the time of the contract. The word "any" means exactly what it says, and a consumer loan certainly falls within the category of "any contract."

> Section 13(b), when read in conjunction with Section 13(a), provides for a further limitation on interest rates but is applicable only to consumer loans and credit sales. Section 13(b) specifically limits the maximum interest rate on such loans to 17 percent. These separate subsections are in no way conflicting and each has its own penalty for violations.

> It is clear, therefore, that the provisions of Amendment 60 have a two-fold limitation on the maximum amount of interest a lender can charge on a consumer loan or credit sale — the lesser of 17 percent or 5 percent over the Federal Reserve Discount Rate. Here, since this contract has a rate of interest in excess of the lawful rate provided for under Section 13(a), it is void as to the unpaid interest as provided by Section 13(a)(ii).

*Id.* at 110, 655 S.W.2d at 429.

In summary, we held that subsections (a) and (b) are to be read together, with the purpose of subsection (b) being a further limitation on consumer loans and credit sales. In asking us to overrule *Bishop* the appellant argues four formal points of appeal. However, those four points can be, in substance, summarized as two alternative arguments: First, the meaning of the

amendment is plain but is contrary to the interpretation given it by this court; that the amendment plainly indicates that subsections (a) and (b) are not to be read together; that under subsection (b), consumer loans and credit sales are to have a fixed ceiling of 17% without regard to the federal reserve discount rate; that the federal reserve discount rate is applicable only to "general loans," which are something less than all loans since the term does not include consumer loans or credit sales. Second, if appellant's first argument cannot be gleaned from the amendment's language, the amendment is ambiguous; that if there is an ambiguity, this court must look to rules of construction and extrinsic evidence to discover legislative intent; and these rules and the evidence support appellant's asserted interpretation.

These arguments are the same arguments which we considered and rejected in *Bishop*. There, we clearly held that the meaning of the amendment was plain and contrary to the interpretation advanced by the appellant. We held there was no ambiguity and, therefore, no need to resort to rules of construction or to extrinsic evidence.

Even if the majority of the present court thought that the amendment were ambiguous, we would not adopt the appellant's argument concerning the intent of the voters in adopting the amendment. The only reason for including a usury provision in the constitution is for the protection of the consumer. The ballot title on this amendment provided that it was "to control interest rates and set the penalty for violations thereof." A voter most likely would have intended that he should have the protection of an interest rate which floats with the economic demand of the time, that is, 5% above the federal reserve discount rate for all credit users, yet, at the same time, protects the small borrower on consumer loans and credit sales from an aberration of rates, such as existed in 1981, with a ceiling of 17%.

In addition, this has been our interpretation since we decided *Bishop* in 1983. We have stated:

> A cardinal rule in dealing with constitutional provisions is that they should receive a consistent and uniform interpretation so that they shall not be taken to mean one thing at one time, and a different thing at another time. Certainly, when a constitutional provision or a statute has been

construed, and that construction consistently followed for many years, such construction should not be changed.

*O'Daniel* v. *Brunswick Balke Collender Co.,* 195 Ark. 669, 674, 113 S.W.2d 717, 719 (1938).

Our interpretation of Amendment 60 has been a part of the law of this State for almost five years, and we will not change it without sufficient reason. However, our concern for *stare decisis* is not our only reason for rejecting the appellant's arguments. We continue to feel that in *Bishop* we correctly interpreted the amendment, and we take this opportunity to reaffirm our commitment to that decision.

Affirmed.

HOLT, C.J., HICKMAN, and HAYS, JJ., dissent.

GLAZE, J., concurs.

TOM GLAZE, Justice, concurring. While I join the majority, I cannot agree that provisions (a) and (b) of section 13 of amendment 60 are clear and unambiguous. In my view, no one can read the language contained in these two provisions without being confronted with a genuine dilemma as to what was intended. I write this concurrence to attempt to illustrate how this court should have construed this ambiguous provision. Since after utilizing the proper rules of construction the same result would be reached as in *Bishop*, I am obliged to join the majority in affirming our previous holding.

As pointed out in Justice Hickman's dissent, the amendment can be read two ways: (1) consumer loans are only limited by the lawful maximum rate of 17% interest under provision (b); or (2) consumer loans are additionally entitled to any protections afforded in provision (a) which provide for a maximum rate of 5% interest above the federal discount rate. As is often the case with newly enacted statutes and constitutional provisions, a language problem arose when construing and applying amendment 60, and this court was, and again is, called on to resolve the existing ambiguity and to determine the constitutional intent of the amendment.

Conceding that an ambiguity is inherent in the wording of amendment 60 does not in any way decide the issue before us.

Such a concession does, however, compel a further duty by this court to analyze and construe amendment 60 to determine its intent rather than merely saying, as the court did in *Bishop*, that the "plain meaning" of the language in amendment 60 requires consumer loans to be subject to the discount rate formula in provision (a).

In the present case, the appellant, in an effort to provide insight as to the intent of the drafters of amendment 60, proffered testimony by certain respected bankers, a state senator and an economist. However, none of the proffered testimony is admissible. We have stated numerous times that courts may look to legislative journals and public documents where there is ambiguity, in order to find the intention of the legislature. *See, e.g., Wiseman v. Madison Cadillac Co.*, 191 Ark. 1021, 88 S.W.2d 1007 (1935). But this court has never held that a senator or representative may testify giving his or her opinion on the subject; in fact, the *Wiseman* court made it very clear that extraneous aids were not admissible when they merely encompassed individual views regarding legislative intent. The court further said, "So in ascertaining the meaning of a statute the court will not be governed or influenced by the views or opinions of any or all of the members of the legislature, or its legislative committees or any other person." *Id.* at 1025, 88 S.W.2d at 1009.

The appellant, in our case, is apparently well read on the dissenting opinion in *Bishop*; however, in my view that opinion served only to mislead its readers by suggesting that the use of extrinsic evidence is a permissible method to determine the meaning of amendment 60. In suggesting that evidence from the draftsmen of amendment 60 should be admissible, the dissenters cited *Sutherland Statutory Construction*, but neither *Sutherland* nor the cases cited in the *Bishop* dissent permit that conclusion. For example, in *Railroad Roofing v. Financial Fire & Casualty Company*, 171 N.J. Super. 375, 409 A.2d 300 (1979), the court quoted the following from *Sutherland*:

> In recognition that there is no necessary correlation between what the draftsman of the text of the bill understands it to mean and what members of the enacting legislature understand, and that the intent of the legislature is the determining consideration as compared to the

views of the draftsman, their views are not generally considered proper grounds on which to base the interpretation of an act, in this country any more than in England. However, if the draftsman's views were clearly and prominently communicated to the legislature when the bill was being considered for enactment, so as to give reason to believe that the legislators' understanding of the bill would have been influenced by the draftman's communicated views and so as to be visible to others who are concerned to understand the meaning of the act, there is reason to invoke an exception of the general rule and attach weight to the draftman's views.

The court in *Railroad Roofing* went on to conclude that the extrinsic information offered there had not been clearly and prominently communicated to the legislature.

The *Bishop* dissent also cites *American Waterways Operators, Inc. v. United States*, 386 F. Supp. 799 (D.D.C. 1974), where the court considered the construction placed upon an act by the administrators who participated in its drafting and who made their views known to Congress as shown by the Senate debates on the conference committee report. In Congress, official verbatim records of committee meetings and debates are kept, and in the federal courts statements of members of the committee or of interested parties at the hearing have been considered as aids in determining the legislative intent. *See Sutherland Stat. Const.* § 48.10 (4th Ed). However, the Arkansas General Assembly, unlike Congress, does not maintain a record of its proceedings, and therefore has no record from which courts could ascertain legislative intent. In sum, the *American Waterways* case is in no way helpful in resolving the issue involving amendment 60 in *Bishop* or in the present case.

In construing an ambiguous provision, this court should focus on voters' intent and not the intent of legislators or vested-interest groups. We have held that in construing the provisions of the constitution we endeavor to effectuate as nearly as possible the intent of the people in passing the measure, and if necessary as a means of attaining that end, a liberal interpretation will be warranted as it may be ascertained from the language used. *See Knox v. Williamson*, 241 Ark. 455, 408 S.W.2d 501 (1966);

*Raney* v. *Raulston*, 238 Ark. 875, 385 S.W.2d 651 (1965). The court now faces the problem of how to determine the voters' intent. The dissenters in *Bishop* would have us believe that we should consider newspaper articles and media broadcasts as evidence allowable under A.R.E. Rule 803(24) to ascertain the voters' intent. Again, the *Bishop* dissent wrongly cites Arkansas cases for the proposition that liberal views of evidence should be taken in statutory construction. That proposition has never been the law in Arkansas, and there is no case authority for allowing newspaper articles and media broadcasts into evidence to show the voters' intent under the hearsay exception, Rule 803(24).

In determining the meaning of section 13 of amendment 60, we must look to the amendment itself and its ballot title to ascertain the voters' intent. The ballot title stated the following:

An amendment to section 13 of article XIX of the Constitution of the State of Arkansas to control interest rates and set the penalty for violation thereof.

From the above language, the voters were asked to control Arkansas's interest rates. Arkansas's prior constitutional provision provided for a maximum rate of interest of 10% regardless of whether a loan was commercial or a consumer one. All parties agree that Arkansas's new amendment limits consumer loans to a maximum interest rate of 17%. The question, however, is did the voters intend that they should benefit from the control regulation in provision (a) of the amendment when that federal reserve discount rate affords a lower interest rate than the 17% amount provided in provision (b)? Quite clearly, it would seem reasonable to apply such a construction to the meaning of provision (a) not only because voters, as consumers, would normally be expected to limit or control the amount of interest they would pay on a loan, but also because the language in (a) states in effect that in *any contract*, the maximum legal rate shall not exceed 5% per annum above the federal reserve discount rate. While appellant argues the words *any contract* should be limited to commercial loans only, such a proposition is far from clear, given the confusing language in amendment 60. Appellant's argument also ignores the logic that voters would normally be expected to avail themselves of the lowest interest rate, if two different rates were available, as may be the case under provisions (a) and (b) of

amendment 60. Under the appellant's theory or construction of the amendment, commercial loans, given the money market today and during the past few years, would be limited to substantially lower legal interest rates than the 17% rate which appellant says it should be able to charge for a consumer loan. Again, such an argument does not seem compatible with the voters' intent when trying to give meaning to what they had in mind when they voted to control interest rates.

While I am of the view that news articles and other printed materials are not permissible for the court to consider in its attempt to give meaning to amendment 60, I did review the articles and materials proffered in *Bishop* and found they were of little value. In fact, those materials could be read to support either of the two views argued in *Bishop* and here. On the other hand, the individual views given both here and in *Bishop* are very much weighted in favor of the position that consumer loans are subject only to the maximum rate of 17% interest under provision (b) and not the discount rate calculated under provision (a). But, for reasons I have set out above, those individual views are simply not admissible.

Undoubtedly, if our General Assembly had a system by which a record could be made of its proceedings *when construing and passing legislation*, valuable information would then be available to the courts when confronted with constitutional and statutory problems such as that presented in *Bishop* and the case at hand. Until such extrinsic-aid information is provided for our courts, this court is not allowed to consider extraneous testimony from draftsmen, sponsors, legislators and others. The dissent in *Bishop* and the dissenters in this case are wrong in suggesting otherwise. If we are to allow testimony of special interest groups which might be knowledgeable of constitutional amendments, it would appear just as plausible to permit voters to testify concerning their opinions.

Because I am of the opinion that the appellant has not demonstrated that the *result* reached in *Bishop* was wrong, I believe the majority court is correct in refusing to overrule that decision.

JACK HOLT, JR., Chief Justice, dissenting. I join my colleague Justice Hickman in his dissent and note with approval the

conclusions of Special Justice Richard F. Hatfield in his dissenting opinion in *Bishop* v. *Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983), when he observed that the majority erred in its interpretation of Amendment 60 in two respects:

> 1. It fails to properly consider the entire document and give meaning to each word by concentrating on the wording of Section 13(a)(i), and,

> 2. It views Amendment 60 too strictly and, in a sense, in a vacuum. Since it finds no ambiguity in the document, it does not consider the history of the times and voters' intent in passing Amendment 60. Furthermore, their construction does not, in my judgment, follow the plain meaning of Amendment 60 when this history is examined.

I think the majority was wrong in *Bishop*, when it declared that the language used in Amendment 60 is clear and unambiguous, and is wrong again now. Since the majority finds that *Bishop* is established precedent that the meaning of the Amendment is plain, that there is no ambiguity, and that there is no need to resort to rules of construction or to extrinsic evidence, it has closed the door on Amendment 60. For me to labor over rules of construction or to editorialize as to the admissibility of the extrinsic evidence offered by appellant in this case would be wasted effort and of little, if any, value.

I dissent.

Hays, J., joins in this opinion.

DARRELL HICKMAN, Justice, dissenting. The majority implies the decision in *Bishop* v. *Linkway Stores, Inc.*, 280 Ark. 106, 655 S.W.2d 426 (1983), may have been wrong or based on a faulty premise but will stand anyway. Of course, the *Bishop* decision was entirely wrong in its first premise and that is the language of the amendment is clear and unambiguous. If the language were clear, there would have been no dispute among court members then or now. The language of Amendment 60 is not clear, and we do have to find its meaning. The amendment reads:

(a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.

(ii) All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.

(b) Consumer Loans and Credit Sales: All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest and the General Assembly shall prohibit the same by law.

The amendment can be read two ways: as the majority chose to read it in *Bishop*, or as providing for a maximum of 17% interest rate on consumer loans and a maximum rate of 5% interest above the federal discount rate on all general loans. Why would paragraph (b), regarding consumer loans, be included if it did not have significance? Why doesn't the amendment say that paragraph (b) is subject to paragraph (a)? It doesn't because consumer loans are to be treated differently, having a maximum of 17% interest rate.

We went over all this in *Bishop*, and I can understand the reluctance of the majority to overrule *Bishop*. But to permit a bad decision regarding a constitutional provision to remain, especially when it can be corrected early (this is our first opportunity to reexamine *Bishop*), is simply poor appellate practice. More than anything, the constitution should be correctly interpreted.

If we followed the majority's reasoning, we would never overrule a decision. In *City of Hot Springs* v. *Creviston*, 288 Ark. 286, 705 S.W.2d 415 (1986), we overruled 50 years of decisions regarding bond issues to finally read the constitution the way it should be read. The error regarding revenue bonds compounded

as years went on; it could have been stopped dead in its tracks if this court had faced its responsibility. While I foresee no doom from the majority decision, I do see a clear mistake uncorrected.

Finally, the majority says that anyway the principle of *stare decisis* applies. I applaud this statement because I was beginning to think the majority had forgotten that principle of law. *See Southern Farm Bureau Life Ins. Co.* v. *Cowger*, 295 Ark. 250, 748 S.W.2d 333 (1988); *Midgett* v. *State*, 292 Ark. 278, 729 S.W.2d 410 (1987).

I would correct the mistake now.

Hays, J., joins in this opinion.